**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, **Plaintiffs,** -against- HORIZON ORTHO SUPPLY CORP., NARMINA ALIEVA, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5, **Defendants.** | CIVIL ACTION 23-CV-5874 COMPLAINT (TRIAL BY JURY DEMANDED) |

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company, (hereinafter "**Plaintiffs**"), by their attorneys, Morrison Mahoney LLP, for their Complaint against Defendants Horizon Ortho Supply Corp. ("Horizon Ortho Supply"), Narmina Alieva ("Alieva") (Horizon Ortho Supply and Alieva are collectively referred to as "**Retail Defendants**"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1.      From at least November 2013 and continuing through the date of the filing of this Complaint, Defendants engaged in nearly identical schemes to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2.      This action seeks to recover more than $167,300.00 that Defendants stole from Plaintiffs through the submission of hundreds of false and/or fraudulent insurance claims for post-surgical rehabilitative durable medical equipment ("DME") devices, in particular, Continuous Passive Motion ("CPM") machines and water circulating units and/or cold therapy units (hereinafter "CTUs") (collectively "Rental DME").

3.    At all relevant times mentioned herein, each and every piece of Rental DME supplied by Horizon Ortho Supply was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.    To execute the scheme to defraud alleged herein, Defendant Alieva, through Horizon Ortho Supply, entered into separate arrangements with one or more of the wholesalers, and one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.    Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

(i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME, including Rental DME, to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Defendants, among others;

(ii) fabricating and/or falsifying DME prescriptions by:

(a) utilizing blank prescription forms signed by their HCPs in order to unilaterally fill in the prescription with expensive and unnecessary DME;

(b) fraudulently altering otherwise valid prescriptions issued by their HCPs by adding or changing the DME prescribed in order to conform the prescription to a pre-determined protocol designed to maximize reimbursement by insurance companies; and/or

(iii) ensuring that the prescriptions were sufficiently generic and/or formulaic so that the nature, quality and cost and medical necessity of any DME could not be verified based on the description of the prescribed item alone.

6.     The use of generic and/or formulaic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the Rental DME prescribed and dispensed to the patient, if any items were legitimately prescribed and dispensed at all; (ii) misrepresent the medical necessity of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.     Pursuant to the fraudulent prescriptions, Horizon Ortho Supply routinely provided (or purported to provide) a nearly identical battery of Rental DME for the same and/or similar duration, to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.     On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.     In many instances, Alieva submitted to Plaintiffs, through Horizon Ortho Supply, prescription forms which they knew to be fabricated and/or fraudulently altered, in order to misrepresent the quality and medical necessity of Rental DME actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.     After obtaining the fraudulent prescriptions from the No-fault Clinics, Alieva, through Horizon Ortho Supply, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the nature and quality of the items, the amounts they were entitled to be reimbursed and/or the medical necessity of the purportedly prescribed Rental DME.

11.    In carrying out the scheme to defraud, Defendants stole in excess of $167,300.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

### STATUTORY/REGULATORY SCHEME

12.    Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

13.    As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for Rental DME that was never provided, not provided as billed or, if provided, was otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar Rental DME.  Exhibit "1" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs to Horizon Ortho Supply for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

14.    Defendant Horizon Ortho Supply is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Horizon Ortho Supply accepted (and continue to accept) assignments of

benefits from Covered Persons and submitted (and continue to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

15.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., Horizon Ortho Supply submitted claims to Plaintiffs using the claim forms prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), including the "No-Fault Assignment of Benefits Form" or form "NF-AOB" and a bill in the form of the "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form (such as the "Health Insurance Claim Form" or "CMS Form 1500").

16.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by Horizon Ortho Supply contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or statement of claim for any commercial or personal insurance benefit containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto…commits a fraudulent insurance act, which is a crime….

17.     At all relevant times mentioned herein, Horizon Ortho Supply identified the DME it purportedly provided to Covered persons on the claim forms using Healthcare Common Procedure Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers for Medicare & Medicaid Services (CMS) used to identify services not identified in the American Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia* durable medical equipment and orthotic devices.

18.     At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

19.      At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service-related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

20.     By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

21.     At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

22.     At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-

authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services..."

23.     Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. seq*.), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances (hereinafter the "Fee Schedule"). The Fee Schedule was in effect at all dates of service mentioned herein.

24.     The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, in accordance with Medicaid rules, shall be the *lesser* of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

25.     Effective July 11, 2007, for DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and orthotic devices by also adopting the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Medicaid DME Fee Schedule"), 12 N.Y.C.R.R. § 442.2 (a) (effective through June 7, 2021), which lists such devices by corresponding HCPCS Level II code.

26.     In view of the adoption by the WCB of the New York State Medicaid DME Fee Schedule, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Fee Schedule that was, and is, in effect at all relevant times mentioned herein.

27.     Accordingly, at all relevant times mentioned herein, providers of DME are entitled to reimbursement in the amounts set forth in the Fee Schedule.  At all relevant times mentioned herein with respect to items not listed on the Fee Schedule (hereinafter "Non-Fee Schedule" items), the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public (sometimes referred to herein as the "Lesser of Standard"). 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021).

28.     At all relevant times mentioned herein, under the Fee Schedule, providers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."  12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

29.     Furthermore, at all relevant times, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment

in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

30.     By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which was to become effective June 7, 2021, with the result that the Fee Schedule and the Lesser Standard remained effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard on April 4, 2022. New York Workers' Compensation Board Bulletin        Nos.        046-1408        (May        24,        2021) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1408.jsp), 046-1496 (Feb. 3, 2022) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1496.jsp).

31.     At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

32.     Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

33.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Alieva, through Horizon Ortho Supply, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the DME provided, if provided at all, as well as the cost, quality, and medical necessity of the billed-for DME.  To the extent the DME was provided at all, each item was medically unnecessary because it was provided

pursuant to a predetermined course of treatment, irrespective of medical need, and was billed in an amount far in excess of what the Retail Defendants were entitled to be reimbursed.

34.     In furtherance of the scheme to defraud alleged herein, Horizon Ortho Supply as a matter of pattern, practice and protocol, routinely provided Covered Persons with expensive Rental DME that was medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

35.     As part of a fraudulent protocol of treatment, after receiving a standard battery of medical treatment, including the provision of several pieces of DME such as cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools; back braces, cervical collars, knee braces, and/or shoulder braces, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey. These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medical necessary. On the same day as the surgery, and within a few short days after the surgery, Horizon Ortho Supply, among others, delivers to the Covered Persons expensive rental and/or compression devices that are not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration. The Covered Persons receive up to four such medically unnecessary items from the providers of rental and/or compression devices, for up to 29 days, in many cases billing in excess of $7,000.00 for a total cost of all of the items, as part of the scheme to financially enrich Horizon Ortho Supply through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Covered Persons were actually injured and in need of treatment.

36.     On information and belief, Horizon Ortho Supply was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

37.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any Rental DME at all, provided Covered Persons with medically unnecessary equipment pursuant to a pre-determined treatment protocol and/or inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

38.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud— although that would be troubling enough—rather, they adopted fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity. Every facet of Defendants' operations, from securing fraudulent prescriptions for DME pursuant to a predetermined course of treatment, that misrepresented the nature, quality, cost, and medical necessity for the devices purportedly provided, was carried out for the purpose of committing fraud.

39.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME.  In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of the Retail Defendants' No-fault claims because Alieva, through Horizon Ortho Supply, submitted (1) false and fraudulent insurance claims for medically unnecessary DME to Plaintiffs deliberately

misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiffs for DME that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity. Such claims continue to be submitted by and/or in the name of the Horizon Ortho Supply and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

40.    By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing in excess of $121,200.00 as a representative sample in unpaid No-fault claims that form the basis of Plaintiffs request for declaratory relief.

## NATURE OF THE ACTION

41.    This action is brought pursuant to:

i)    The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)    New York State common law; and

iii)    the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

42.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' schemes to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiffs for DME they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

43.    Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of Horizon Ortho Supply's unpaid No-fault claims because:

i)      The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and/or

ii)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that were provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

44.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $167,300.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for DME that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## **THE PARTIES**

**A.**     **Plaintiffs**

45.     Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

46.     Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

47.     Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

48.     Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

49.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property & Casualty Insurance Company are collectively referred to herein as "Plaintiffs."

50.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law

**B.    The Individual Defendant**

51.     Narmina Alieva ("Alieva") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retail Defendant Horizon Ortho Supply and, at all times relevant herein, operated, managed, and/or controlled its activities.

**C.    The Retail Defendant**

52.     Horizon Ortho Supply Corp. ("Horizon Ortho Supply") was incorporated on or about November 26, 2013, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 815 Avenue H, Brooklyn, NY 11230.   Horizon Ortho Supply is operated, managed, and/or controlled by Defendant Alieva and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME under the No-fault Law.

**D.    The John Doe Defendants**

53.     On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

E.      **The ABC Corporations**

54.     On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme.  These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

55.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

56.      This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

57.     This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

58.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

59.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

60. Plaintiffs underwrite automobile insurance in New York State and participates as an insurer in New York State's No-fault program.

61. As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

62. Horizon Ortho Supply is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for its services, Horizon Ortho Supply accepts assignments of benefits from the Covered Persons covered under the No-fault Law and submits claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

63. To process and verify the claims submitted by Horizon Ortho Supply, Plaintiffs required, and Horizon Ortho Supply submitted, prescriptions and other documents relating to the DME allegedly supplied to Covered Persons for which Horizon Ortho Supply was seeking reimbursement from Plaintiffs.

64. In nearly all instances, the prescriptions submitted in support of Horizon Ortho Supply's claims for reimbursement were fraudulent, fabricated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

65. At all relevant times mentioned herein, in each bill submission to No-fault insurers in general, and Plaintiffs in particular, Horizon Ortho Supply made the following representations to each recipient:

16

- The bill for DME was based on a valid prescription by a healthcare practitioner licensed to issue such prescriptions;

- The prescription for DME was not issued pursuant to any unlawful financial arrangements;

- The DME identified on the bill was actually provided to the Covered person based on a valid prescription identifying medically necessary items

- The billing code used on the bill actually represents the DME and all included services that was provided to the Covered Person; and

- The fee sought for the billed for DME did not exceed that permissible under the No-fault law and regulations.

66.    Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process Horizon Ortho Supply's claims within 30 days of receipt of proof of claim.

67.    To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Horizon Ortho Supply in support of their claims, and paid Retail Defendants based on the representations and information contained in the bills and documentation that Retail Defendants mailed to Plaintiffs.

68.    At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

69.     At all relevant times mentioned herein, for DME and orthotic devices, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2. (effective through June 7, 2021).

70.     At all relevant times mentioned herein, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Medicaid DME Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

(1)     the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

(2)     the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2. (effective through June 7, 2021).

71.     At all relevant times mentioned herein, the regulation provides that suppliers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."  12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

72.     Furthermore, at all relevant times mentioned herein, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

73.     At all relevant times mentioned herein, as a result of the WCB's delay of implementation of amendments to 12 N.Y.C.R.R. § 442.2, intended to become effective June 7, 2021, the fee schedule set by the New York State Medicaid Program and adopted by the WCB,

and the Lesser of Standard continued to set the maximum permissible charge for DME and/or orthotic devices dispensed through April 3, 2022. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021), 046-1496 (Feb. 3, 2022).

74.    Horizon Ortho Supply was created in connection with an elaborate scheme to fraudulently bill No-fault insurance carriers for DME  that was never provided, was not provided as billed or, if provided, was otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Covered Persons received the same or similar battery of Rental DME.

75.    The Rental DME that Horizon Ortho Supply purported to provide, and for which it billed Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.  Instead, Alieva, through Horizon Ortho Supply, created a billing apparatus implementing a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

76.    Alieva created and controlled Horizon Ortho Supply, which was part of a well-organized illegal enterprise that engaged in pervasive fraudulent practices that distinguished it from legitimate providers of Rental DME.  The components of the enterprise followed practices that were part of a racketeering scheme dictated by Alieva, including, but not limited to, one or more of the following practices:

- Unlike legitimate retail DME companies, Alieva, through Horizon Ortho Supply, misrepresented the nature, quality, and cost of DME purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, Alieva, through Horizon Ortho Supply, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Alieva, through Horizon Ortho Supply, submitted bills to Plaintiffs for DME that were never provided to Covered Persons;

- Unlike legitimate retail DME companies, Alieva, through Horizon Ortho Supply, misrepresented the acquisition costs and/or usual and customary price of items purportedly supplied to Covered Persons;

- Unlike legitimate retail DME companies, Alieva, through Horizon Ortho Supply, submitted prescriptions, bills, and delivery receipts to Plaintiffs for DME that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided as well as the medical necessity for the items;

- Unlike legitimate retail DME companies, Alieva, through Horizon Ortho Supply, concealed the fact that the DME were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Alieva, through Horizon Ortho Supply, concealed the fact that the prescription forms submitted in support of its claims for reimbursement were fabricated and/or fraudulently altered in order to maximize reimbursement regardless of medical necessity;

- Unlike legitimate retail DME companies, Alieva, through Horizon Ortho Supply, and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Alieva, through Horizon Ortho Supply, arranged to have prescriptions for DME delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers; and

- Unlike legitimate retail DME companies, Alieva, through Horizon Ortho Supply, entered into illicit relationships with the No-fault Clinic, which, in exchange for kickbacks and/or a fee, provided Horizon Ortho Supply with prescriptions and/or referrals for expensive Rental DME devices pursuant to a predetermined course of treatment, irrespective of medical necessity.

77.    In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

78.    The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises. By way

of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Alieva engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their HCPs generated large volumes of prescriptions for Rental DME to their patient population, and/or (ii) fabricate and/or fraudulently alter prescriptions issued by the HCPs, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Submitted or caused to be submitted, on behalf of Horizon Ortho Supply, numerous fraudulent claim forms seeking payment for DME devices that were purportedly (but not actually) provided to many Covered Persons;

- Submitted or caused to be submitted, on behalf of Horizon Ortho Supply, prescription forms in support of requests for payment for DME, which they knew to be fabricated and/or fraudulently altered;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

79.     At all relevant times mentioned herein, Alieva knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Rental DME.

80.     At all relevant times mentioned herein, Alieva, through Horizon Ortho Supply, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and/or claim forms, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

81.     At all relevant times mentioned herein, Alieva and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

82.    Beginning in November 2013 and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of Rental DME to Covered Persons.

83.    Alieva incorporated, owned and/or controlled Horizon Ortho Supply for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

84.    Horizon Ortho Supply, through Alieva, engaged in a pervasive scheme to defraud, wherein Alieva: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered; (iv) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (v) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for Rental DME that were purportedly provided to Covered Persons based on medical necessity when, in fact, Alieva, through Horizon Ortho Supply, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving substantially similar DME for a substantially similar timeframe regardless of medical necessity.

85.    Defendants devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive DME that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment

protocol, irrespective of medical necessity, materially misrepresented in their fraudulent bill submissions to Plaintiffs.

86.     Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements, would issue a prescription for a standard battery of DME, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary, including but not limited to prescriptions for DME.

87.     Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

88.     As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with one or more of the Retail Defendants, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to Horizon Ortho Supply by: (i) causing their HCPs to write DME prescriptions in accordance with a pre-determined protocol; and/or (ii) fabricating and/or falsifying DME prescriptions, or altering the prescriptions, and filling in the prescription with expensive and unnecessary DME.

89.     In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for DME.  Instead, these prescriptions were given directly to Retail Defendants to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of DME.

90.     Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

91.     In every instance, in furtherance of the scheme to defraud alleged herein, the delivery receipts describe the DME in the same generic, non-descript manner as the prescriptions and claim forms submitted by Covered Persons in support of its claims for reimbursement.

92.     In furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by Horizon Ortho Supply to Plaintiffs routinely misrepresented the DME provided.

93.     In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, virtually every bill submitted by Horizon Ortho Supply deliberately obscured all identifying information relating to the billed-for DME so as to prevent Plaintiffs from determining the appropriate charges associated with any such DME or whether the specific DME was medically necessary.

94.     Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## FRAUDULENT BILLING OF RENTAL DME ITEMS

95.     In furtherance of the scheme to defraud alleged herein, Horizon Ortho Supply, as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME items that were medically unnecessary and provided, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

96.     As part of the scheme, the Covered Persons receiving the expensive rental DME, compression devices, and related appliances were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment.  Shortly after the accident, the Covered Persons are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture, and several pieces of DME and/or orthotic devices—in some instances, receiving up to eighteen (18) items.

97.     As part of this standard battery of treatment and prescribed contemporaneously with the battery of standard DME, Horizon Ortho Supply routinely provides Covered Persons with a CPM device and a CTU device, invariably on a rental basis for a period of up to twenty-nine days, and twenty-two days, respectively.

98.     Months after the accident, as part of the fraudulent protocol of treatment, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

99.    On the same day as the surgery, and/or within a few short days after the surgery, the Covered Persons are prescribed expensive rental DME devices, related appliances, as well as other DME and/or orthotic devices as part of a pattern and protocol of treatment to maximize reimbursement for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration. In many cases, in addition to the standard battery of DME, the Covered Persons receive at least five or more Rental DME items, for up to 29 days or longer, in some cases exceeding $8,000.00 in a total cost for all of the items. By way of example and not limitation, the following Covered Persons received the same or similar battery of rental DME, compression devices, related appliances, as well as a battery of standard DME and/or orthotic devices:

- In connection with claims submitted on behalf of Covered Person L.S., claim number 0459830575-02, Plaintiffs were billed for at least eleven items of DME and/or orthotic devices together with rental DME and accompanying appliances purportedly provided by four different companies amounting to $8,266.81.  On August 15, 2017, Longevity Medical Supply, Inc. (not named as a defendant in the Complaint) purportedly provided a shoulder elbow wrist hand orthosis device for $499.12. Later, on November 18, 2017, Longevity Medical Supply, Inc purportedly provided a lumbar-sacral orthosis device for $806.64, and a cervical traction device for $502.63.  Starting January 5, 2018, MiiSupply LLC (not named a defendant in the Complaint) purportedly provided a Sustained Acoustic Medicine ("SAM") unit for a twenty-eight-day rental period, for the total amount of $2,942.80, along with accompanying coupling patches for $574.00. On February 9, 2018, Protechmed, Inc. (not named a defendant in the Complaint) purportedly provided a pneumatic compression device for a single day rental at an ASC for $531.06, and accompanying appliance, for $89.56. Starting less than a week later, Defendant Horizon Ortho Supply purportedly provided a CTU pump for a fifteen-day rental period for $345.00, along with accompanying pad for $20.00, and a CPM device for a twenty-two-day rental period for a total of $1,936.00, along with accompanying sheepskin pad for $20.00.

- In connection with claims submitted on behalf of Covered Person A.C., claim number 0489065458-06, Plaintiffs were billed for at least eighteen items of DME and/or orthotic devices together with rental DME and accompanying appliances purportedly provided by four different companies

amounting to $6,919.26. On January 24, 2018, Myrtle Avenue Trading LLC (not named as a defendant in the Complaint) purportedly provided a cervical pillow for $22.04, an electric heat pad for $20.93, an eggcrate mattress for $155.52, a massager for $155.00, a lumbar cushion for $282.40, an LSO for $322.98, a knee brace for $607.55, an ankle brace for $331.47, and a shoulder brace for $499.12. On March 21, 2018, Five Borough Supply Inc (not named a defendant in the Complaint) purportedly provided a cervical traction unit for $502.63 and an LSO for $1,150.00. On March 23, 2018, Protechmed, Inc. (not named a defendant in the Complaint) purportedly provided a pneumatic compression device for a single day rental at an ASC for $531.06, accompanying appliance for $89.56, and cane for $12.00. Starting less than a week later, Defendant Horizon Ortho Supply purportedly provided a CTU pump for a fifteen-day rental period for $345.00, along with accompanying pad for $20.00, and a CPM device for a twenty-two-day rental period for a total of $1,870.00, along with accompanying sheepskin pad for $20.00.

- In connection with claims submitted on behalf of Covered Person M.K., claim number 0491714993-02, Plaintiffs were billed for at least seventeen pieces of rental DME, compression devices, related appliances and DME and/or orthotic devices purported provided by three different companies amounting to $7,315.99. On April 3, 2019, Goldstar Equipment, Inc. purportedly provided a custom-fit Lumbar-sacral orthotic device in the amount of $844.13. On May 4, 2018, Protechmed, Inc. (not named as a defendant in the Complaint) purportedly provided a pneumatic nonsegmental compressor in the amount of $531.06, a nonsegmental pneumatic appliance in the amount of $89.56 and a cane in the amount of $17.00. Thereafter, on May 25, 2019, Protechmed, Inc. purportedly provided a pneumatic nonsegmental compressor in the amount of $531.06, a nonsegmental pneumatic appliance in the amount of $89.56 and a cane in the amount of $17.00. Starting on May 29, 2019, Defendant Horizon Ortho Supply purportedly provided a Cold Therapy Unit, rented for a fifteen day period for the total amount of $345.00 along with a Cold Therapy Unit Pad for $20.00., and a Continuous Passive Motion Device, rented for a twenty-two day period for the total amount of $1,870.00, along with sheepskin pad for $20.00. On July 13, 2019, Protechmed, Inc. purportedly provided a pneumatic nonsegmental compressor in the amount of $531.06 and a nonsegmental pneumatic appliance in the amount of $89.56. Finally, starting on July 23, 2018, Defendant Horizon Ortho Supply purportedly provided a Cold Therapy Unit, rented for a fifteen day period for the total amount of $345.00 along with a Cold Therapy Unit Pad for $20.00., and a Continuous Passive Motion Device, rented for a twenty-two day period for the total amount of $1,936.00, along with sheepskin pad for $20.00.

- In connection with claims submitted on behalf of Covered Person A.D.P., claim number 0651274193-03, Plaintiffs were billed for at least five items of DME and/or orthotic devices together with rental DME purportedly provided by two different companies amounting to $4,772.75 over the span of a mere two months. On January 27, 2022, APA Supply Inc. (not named as a defendant in the Complaint) purportedly provided a Lumbar-Sacral Orthosis device for $844.13 and a Right Shoulder Elbow Wrist orthotic device for $499.12. Starting on March 10, 2022, Defendant Horizon Ortho Supply purportedly provided a Cold Therapy Unit, rented for a twenty-two day period for the total amount of $1,540.00, a Continuous Passive Motion device, rented for a twenty-two day period for the total amount of $1,870.00 with accompanying CPM Sheepskin Pad appliance for $19.50.

- In connection with claims submitted on behalf of Covered Person J.J., claim number 0504439968-02, Plaintiffs were billed for at least ten pieces of rental DME, compression devices and DME and/or orthotic devices purportedly provided by three different companies amounting to $4,805.44. On July 5, 2018, Longevity Medical Supply, Inc. (not named as a defendant in the Complaint) purportedly provided a knee orthotic device in the amount of $607.55. Thereafter, on August 9, 2018, Longevity Medical Supply, Inc. also purportedly provided a Cervical Traction Unit with Pump in the amount of $502.63 and a custom-fit LSO in the amount of $806.64. On August 10, 2018, Protechmed, Inc. purportedly provided a pneumatic nonsegmental compressor in the amount of $531.06, a nonsegmental pneumatic appliance in the amount of $89.56 and a cane in the amount of $12.00. Starting on August 14, 2018, Defendant Horizon Ortho Supply purportedly provided a Cold Therapy Unit, rented for a fifteen day period for the total amount of $345.00 along with a Cold Therapy Unit Pad for $20.00., and a Continuous Passive Motion Device, rented for a twenty-two day period for the total amount of $1,870.00, along with sheepskin pad for $20.00.

100. Such devices are medically unnecessary, and far less expensive and intrusive courses of treatment, such as the provision of inexpensive cold packs, would provide the same if not better treatment than the complex devices provided by the Retail Defendants. In that regard, the supply of such items was motivated by money, without regard to the actual need of the patients, for the express purpose of increasing the amount of reimbursement sought from insurers in general, and Plaintiffs in particular.

### 1.    Fraudulent billing for Continuous Passive Motion machines

101.    In furtherance of the scheme to defraud alleged herein, Alieva, through Horizon Ortho Supply, routinely submitted bills to Plaintiffs for Continuous Passive Motion ("CPM") devices that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

102.    As a matter of pattern, practice, and protocol, Alieva, through Horizon Ortho Supply, submitted to Plaintiffs prescription forms which they knew or should have known to be fabricated and/or fraudulently altered, in order to misrepresent that CPM devices were medically necessary, when in fact, the CPM devices were provided, if at all, to financially enrich Alieva through a fraudulent protocol of treatment.

103.    CPM is a modality of post-surgical treatment in which joint motion is provided by a machine without active contraction of muscle groups. A CPM device allows passive movement to be performed to a joint for hours at a time. The theory behind CPM is that recovery will be accelerated by decreasing soft tissue stiffness, increasing range of motion, and promoting healing of joint surfaces in soft tissues, and preventing the development of adhesions. A typical CPM device consists of a carriage for support of the extremity and a controller that is programmed to passively flex and extend the joint through a set range of motion, speed, pause and duration.

104.    CPM devices have no medical utility in limited post-operative circumstances, such as total knee replacements, and other knee indications including rehabilitation following repair of an anterior cruciate ligament prior to active physical therapy.

105.    CPM is not medically useful as a treatment following basic arthroscopic surgical procedures, does not provide any long-term benefit to post-operative management of patients, is no more effective than standard physical therapy and is not supported by the medical literature:

- A systematic review of rehabilitation methods after arthroscopic rotator cuff repair was done by Anthony Yi, et al., and published in the journal *Sports Health* in 2015 (7:326-334), which concluded that it is unknown whether CPM offers any benefit after shoulder surgery.  In addition, research has shown that CPM does not have any advantage for patients having knee surgery. For example, in patients having a total knee replacement, the American Association of Orthopedic Surgery (AAOS) has a Guideline that states: "Strong evidence supports that CPM after knee arthroplasty does not improve outcomes."

- A Cochrane Review was published that involved an analysis of multiple articles, and their conclusion was: *CPM does not have clinically important effects on active knee flexion ROM, pain, function, or quality of life to justify its routine use.* In addition, in a study by Herbold, et al., a matched cohort of patients with total knee replacement were compared, and their conclusion was: *The outcome variables of 61 matched pairs of CPM users and non-CPM users were reported. No statistically significant differences were found in any of the outcomes.*

- A study published in the July 1998 Journal of Bone and Joint Surgery comparing the results of 31 patients randomly assigned CPM therapy or manual passive range of motion exercises for post-operative management of rotator cuff repair, found no significant differences in Shoulder Pain and Disability index scoring for pain and functional disability of each group, and no significant differences between the two groups with regard to the range of motion or strength.

- A study published in the July 16, 2014 Journal of Bone and Joint Surgery comparing the results of 40 patients post treatment of intra-articular knee fractures around the knee, randomly assigned CPM or standardized physical therapy for 48 hours immediately following surgery, found that CPM significantly improved knee flexion in the first 48 hours. However, there was no significant difference in knee pain at 48 hours, no other knee flexion or extension detected at any other time and no benefit of CPM in the immediate post-operative period with regard to knee motion at six months.

106.    In addition to these studies, the Centers for Medicare and Medicaid Services ("CMS") issued a National Coverage Determination concluding that CPMs are only necessary

after total knee arthroplasty, anterior cruciate ligament repair or reconstruction, after cartilage grafting procedures during the non-weight-bearing period to promote healing, and surgical release of arthrofibrosis of any joint.

107.    CMS also stated that CPMs should be provided within 48 hours after surgery and that there is insufficient evidence to justify the use of CPMs beyond 21 days.

108.    Notwithstanding that CPM devices are not medically useful as a treatment following routine knee and shoulder arthroscopic surgical procedures such as those performed on Covered Persons, Alieva, through Horizon Ortho Supply, and pursuant to illicit kickback agreements with the HCPs, filled needless prescriptions for CPM devices to Covered Persons who purportedly underwent such procedures.

109.    Notwithstanding the lack of medical literature supporting the use and/or provision of CPM devices for patients that undergo routine arthroscopic procedures, as a matter of pattern, practice and protocol, such devices were routinely prescribed to Covered Persons and supplied by Horizon Ortho Supply pursuant to a pre-determined protocol of treatment and fraudulent scheme to maximize reimbursement.

110.    Despite the fact that CPMs are not medically necessary for the injuries suffered by most, if not all the Covered Persons, and the lack of sufficient evidence to justify their use beyond 21 days, Horizon Ortho Supply routinely filled prescriptions systematically provided by the HCPs for CPMs to be used for anywhere between 3 and 4 weeks.

111.    Although CPM units can be purchased from legitimate companies for less than Horizon Ortho Supply's accumulated monthly charges for the particular items, Horizon Ortho Supply systematically represented that the inexpensive CPMs dispensed to Covered Persons are

high-quality and expensive units by submitting monthly charges that far exceed the true value of the products.

112.    Specifically, Alieva, through Horizon Ortho Supply, routinely submitted bills to Plaintiffs for the rental of CPM devices for use on joints other than the knee at a rate of $88.00 per day per patient, using billing code E0936, resulting in total charges in amounts ranging from $1,144.00 to $2,552.00 per patient.

113.    In addition, Alieva, through Horizon Ortho Supply, routinely submitted bills to Plaintiffs for the rental of CPM devices for use on the knee at a rate of $85.00 per day, using billing code E0935, resulting in total charges in amounts ranging from $1,190.00 to $2,465.00 per patient. Exhibit "3" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims wherein Retail Defendants submitted fraudulent bills for the rental of CPM Devices to Plaintiffs using billing codes E0935 and/or E0936.

114.    Notwithstanding that the Medicare rate for a CPM is only $21.50 per day, and the WCB DME Fee Schedule rates for Knee CPMs and CPMs for other limbs are only $18.88 per day and $31.19 per day, respectively, the charges by Horizon Ortho Supply far exceed that rate and are grossly inflated in order to maximize their reimbursement in furtherance of the scheme to defraud.

### 2.    Fraudulent Billing of Cold Therapy Units

115.    In furtherance of the scheme to defraud alleged herein, Alieva, through Horizon Ortho Supply, routinely submitted bills to Plaintiffs for Cold Water Circulation Units also known as cold therapy units ("CTUs") that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

116.    CTUs combine cold temperatures and compression to decrease pain, discomfort, bleeding, swelling, use of medication, length of hospital stay and/or length of recovery following injury or surgery to an extremity. The theory behind cold therapy is that by decreasing the temperature of the tissue, which produces vasoconstriction, pain is lessened, muscle spasm is decreased, and inflammation is reduced.

117.    CTUs utilize pneumatic or mechanical pumps that may be battery or electrically operated, and the intended function of the pump is to provide cyclical compression and cooling to the affected area. The purpose of the compression is to remove fluid and decrease edema while providing the cooling. The devices generally consist of two basic parts: a wrap or wrap system designed to cover specific areas of the body, and a control unit or pump, which is filled with ice and/or water. The control unit or pump circulates the cooled water through the wrap system to the affected area

118.    On information and belief, CTUs have been found to be useful for post-operative care of joint reconstruction surgeries in the 3-4 days immediately following surgery.

119.    As a matter of pattern, practice and protocol, Horizon Ortho Supply submitted to Plaintiffs, through Alieva, prescription forms which they knew to be fabricated and/or fraudulently altered, in order to misrepresent that CTUs were medically necessary, when in fact, the CTUs were provided, if at all, to financially enrich Alieva through a fraudulent protocol of treatment.

120.    Specifically, notwithstanding that CTUs are only medically necessary, if at all useful, for post-operative care of joint reconstruction surgeries, Horizon Ortho Supply, through Alieva, and pursuant to illicit kickback agreements with the HCPs, routinely issued prescriptions for CTUs for patients that underwent basic procedures and/or did not have any surgery whatsoever.

121.    While CTUs are dispensed to reduce pain, swelling and inflammation, numerous studies have concluded that they are no more effective than standard ice therapy including the application of ice packs and compression.

122.    For instance, in a study published in the January 2008 Journal of Knee Surgery, the researchers compared postoperative pain control after knee arthroscopy in 53 patients with use of a CTU device compared with a traditional ice therapy regimen and found that though pain intensity was similar between groups throughout the course of the study, there were no significant differences found in the groups regarding functional ability.

123.    In addition, in a systematic review of the literature concerning the use of cryotherapy in acute soft tissue injury published in the July 2001 edition of the International Journal of Sports Medicine, the review concluded that the optimal method of ice application is wet ice applied directly to the skin through a wet towel and that the target temperature reduction is to 10-15 °C.

124.    Furthermore, in a study following 110 patients to assess the effectiveness of postoperative cold therapy after ACL reconstructions, published in the September-October 1996 American Journal of Sports Medicine, the review concluded that ice bags and cooling pads appeared equally effective.

125.    In addition to these studies, on June 9, 2019, the Center for Medicare and Medicaid Studies ("CMS") issued a Local Coverage Determination—No. L33735—in which it concluded that active cold therapy units were not medically necessary due to the availability of alternate therapy, such as traditional cold-pack application, which produce the same therapeutic outcome.

126.    Even when CTUs are medically useful, they should be used for no more than three to four days immediately following surgery.

127.    Despite the fact that CTUs are not medically necessary, Horizon Ortho Supply routinely filled prescriptions systematically provided by the HCPs for the devices to be used for anywhere between two (2) and three (3) weeks.

128.    On information and belief, Horizon Ortho Supply obtained these prescriptions pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between themselves and the No-fault Clinics at which the HCPs were employed.

129.    Although the CTUs can be purchased from legitimate companies for less than the Horizon Ortho Supply's accumulated monthly charges for the particular items, Horizon Ortho Supply systematically represented that the inexpensive CTUs dispensed to Claimants are high-quality and expensive units by submitting monthly charges that far exceed the true value of the products.

130.    By way of example and not limitation, Alieva, through Horizon Ortho Supply, routinely submitted bills to Plaintiffs for CTUs at rates ranging between $23.00 and $70.00 per day, routinely using billing code E0236, and on one occasion, miscellaneous code E1399, resulting in total charges in amounts ranging from $322.00 to $1,540.00 per patient. Exhibit "4" in the accompanying Compendium of Exhibits is a representative sample of claims where Alieva, through Horizon Ortho Supply, submitted fraudulent bills to Plaintiffs for the rental of CTU devices to one or more Plaintiffs.

## DISCOVERY OF THE FRAUD

131.    To induce Plaintiffs to promptly reimburse their claims for Rental DME, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Alieva, through Horizon Ortho Supply, routinely and deliberately submitted claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Alieva, through Horizon Ortho Supply, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Alieva, through Horizon Ortho Supply, knowingly misrepresented and concealed that Horizon Ortho Supply's claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Alieva, through Horizon Ortho Supply, knowingly misrepresented and concealed that the prescriptions from the referring providers were fabrications as part of the scheme to maximize reimbursement for medically unnecessary DME; and

- Alieva, through Horizon Ortho Supply, knowingly and deliberately concealed the amounts Horizon Ortho Supply were entitled to be reimbursed in the bills submitted to Plaintiffs by mispresenting the codes and reimbursement amounts as part of the scheme to manipulate the payment formulas under the applicable DME Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

132.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $167,300.00 based upon the fraudulent bill submissions.

133.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANT ALIEVA, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

## (RICO, pursuant to 18 U.S.C. § 1962(c))

134.    The allegations of paragraphs 1 through 133 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

135.    At all times relevant herein, Horizon Ortho Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

136.    From, in or about November 26, 2013 through the date of the filing of this Complaint, Defendants Alieva, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the Horizon Ortho Supply enterprise through a pattern of racketeering activity, including the numerous acts of

mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

137.    At all relevant times mentioned herein, Defendant Alieva, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Horizon Ortho Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the utilization of fraudulent prescriptions.

138.    One or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing DME pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between the Defendants and the No-fault Clinics, as well as bogus documentation, that grossly inflated the purported cost and/or necessity of the DME to facilitate the fraudulent billing alleged in the Complaint.  One or more of the ABC Corporations furnished documents that Defendant Alieva required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME claims.

139.    It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

140.    The racketeering acts set forth herein were carried out on a continued basis for nearly a ten year period, were related and similar and were committed as part of the ongoing scheme of Defendant Alieva, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 to fraudulently bill for DME to defraud insurers, and, if not stopped, such acts will continue into the future.

141.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Horizon Ortho Supply continues to pursue collection on the fraudulent billing to the present day.

142.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Alieva, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Horizon Ortho Supply enterprise based upon materially false and misleading information.

143.    Through the Horizon Ortho Supply enterprise, Defendant Alieva submitted numerous fraudulent claim forms seeking payment for DME that were purportedly (but not actually) provided to numerous Covered Persons as billed. The bills and supporting documents that were sent by Alieva, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Alieva, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1

through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Horizon Ortho Supply enterprise through the filing of this Complaint.

144.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Alieva in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

145.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

146.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

147.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $167,300.00, the exact amount to be determined at trial.

148.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Alieva, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS HORIZON ORTHO SUPPLY AND ALIEVA

### (Common Law Fraud)

149.    The allegations of paragraphs 1 through 133 are hereby repeated and realleged as though fully set forth herein.

150.    Defendants Horizon Ortho Supply and Alieva made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

151.    Each and every bill and supporting documentation submitted by Defendants Horizon Ortho Supply and Alieva to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Covered Persons and the consumer public.

152.    Defendants Horizon Ortho Supply and Alieva intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the DME purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts Horizon Ortho Supply was entitled to be reimbursed under the No-fault Law;

- With respect to rented DME, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the Covered Persons; and (b) that the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis did not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office, and did not exceed the amount allowed under the Fee Schedule;

- False and misleading prescriptions for the DME purportedly supplied to Covered Persons, generically describing the item to conceal the type of item being prescribed;

- • False and misleading prescriptions for DME, concealing the fact that the (a) DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby Defendant Alieva, through Horizon Ortho Supply paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME; (b) DME was not covered by the applicable DME Fee Schedule; and (c) DME was generically described on the prescriptions, all of which was designed to permit Defendant Alieva, through Horizon Ortho Supply and/or Horizon Ortho Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

153.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Horizon Ortho Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

154.    Defendants Horizon Ortho Supply and Alieva knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

155.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Horizon Ortho Supply and Alieva.

156.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions, and delivery receipts, it would not have paid Defendant Horizon Ortho Supply's claims for No-fault insurance benefits submitted in connection therewith.

157.    Furthermore, the far-reaching pattern of fraudulent conduct by Defendants Horizon Ortho Supply and Alieva evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

158.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $167,300.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

### THIRD CLAIM FOR RELIEF

### AGAINST DEFENDANTS HORIZON ORTHO SUPPLY AND ALIEVA

### (Unjust Enrichment)

159.    The allegations of paragraphs 1 through 133 are hereby repeated and realleged as though fully set forth herein.

160.    By reason of their wrongdoing, Defendants Horizon Ortho Supply and Alieva have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

161.    Plaintiffs are therefore entitled to restitution from Defendants Horizon Ortho Supply and Alieva in the amount by which it has been unjustly enriched.

162.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $167,300.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

**FOURTH CLAIM FOR RELIEF**

**AGAINST THE RETAIL DEFENDANTS**

**(Declaratory Judgment under 28 U.S.C. § 2201)**

163.    The allegations of paragraphs 1 through 133 are hereby repeated and realleged as though fully set forth herein.

164.    At all relevant times mentioned herein, each and every bill mailed by Alieva, through Horizon Ortho Supply, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and effective DME Fee Schedule by materially misrepresenting the DME provided, if provided at all, as well as the cost and quality of the billed for Rental DME.

165.    To the extent the Rental DME were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

166.    At all times relevant herein, the Retail Defendantsexploited the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the amounts the Defendants were entitled to be reimbursed, as well as the medical necessity of the items purportedly provided to Covered Persons.

167.    In view of the Retail Defendants' submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retail Defendantshave no right to receive payment for any pending bills they have submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

168.     As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME purportedly supplied to Covered Persons and the amounts they were entitled to be reimbursed, in order to manipulate the payment formulas under the No-fault Law and effective DME Fee Schedules in their claims submissions, obtain reimbursement far in excess of the maximum permissible charges they were entitled to receive for medically unnecessary items provided pursuant to a fraudulent protocol of treatment, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of the Retail Defendants' No-fault claims.

169.     Plaintiffs have no adequate remedy at law.

170.     The Retail Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)      Compensatory damages in an amount in excess of $167,300.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)     Punitive damages in such amount as the Court deems just;

iii)    Treble damages, costs, and reasonable attorneys' fees on the First Claims for Relief, together with prejudgment interest;

iv)     Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

v)      Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)     Declaratory relief on the Fourth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and/or (2) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii)    Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York,
     August 2, 2023

                                        Morrison Mahoney LLP

                                    By: ___/s/ Lee Pinzow_____
                                        Robert A. Stern, Esq.
                                        James McKenney, Esq.
                                        Lee Pinzow, Esq.
                                        Karina Trost, Esq.
                                        *Attorneys for Plaintiffs*
                                        Wall Street Plaza
                                        88 Pine Street, Suite 1900
                                        New York, New York 10005
                                        (212) 825-1212

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>                                                  Plaintiffs,<br><br>          -against-<br><br><br>HORIZON ORTHO SUPPLY CORP., NARMINA ALIEVA, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>                                                  Defendants. | CIVIL ACTION<br><br>23-CV-5874<br><br>COMPLAINT<br><br>(TRIAL BY JURY DEMANDED) |

# COMPLAINT

MORRISON MAHONEY, LLP
ATTORNEYS FOR PLAINTIFFS
WALL STREET PLAZA
88 PINE STREET, SUITE 1900
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 825-1212